**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALBERTA DOMONIQUE WILSON, for herself and on behalf of her minor children, ROY SMART, ROYAL SMART, and ROYALTY SMART; | ) ) ) ) ) ) | |
| Plaintiffs, | ) | Case No. |
| v. | ) ) | Judge |
| THE CITY OF CHICAGO; Chicago police Officer JOHN NEMEC (Star #19704); and OTHER, CURRENTLY UNKNOWN CHICAGO POLICE OFFICERS, | ) ) ) ) ) | Magistrate Judge |
| Defendants. | ) ) ) | Jury Demanded |

**COMPLAINT**

**INTRODUCTION**

1.      Plaintiffs, by and through their attorney, The Law Offices of Al Hofeld, Jr., LLC, bring this action against defendant City of Chicago and Chicago police officers pursuant to 42 U. S. C. § 1983 for using excessive force against three young children (ages 6, 8 and 9) and their mother, and state as follows:

2.      Before 6:00AM, Friday, March 15, 2019, Alberta Wilson and her children were still sleeping peacefully when scores of Chicago police officers surrounded their house, created noise and light diversions, and called them out over a bullhorn and at rifle-point in order to execute a search warrant.  No guns or other contraband were found during the ensuing search. No one was arrested or charged.

3.      As the family exited their home with arms in the air, a semi-circle of SWAT and other officers aimed their assault rifles at close range at the family, including at the children, despite Ms. Wilson's requests that they lower the guns because of the presence of the children.  Officers' guns were loaded, and their fingers were on the triggers.  The children were afraid that they and their families were going to be shot.

4.      Once the family reached the street, police handcuffed them.  Officers handcuffed short, 8-year-old Royal for no reason for approximately 35-40 minutes while he stood in the street shaking from fear and cold and drenched in the freezing rain.  The handcuffs were too tight, and his wrist bruised.

5.      Officers also handcuffed Ms. Wilson and other adult family members in front of the young children and kept them handcuffed and standing in the cold rain for two hours while officers searched the family's tiny house.

6.      Neither the children nor any of the adults refused to follow instructions, resisted arrested, attempted to flee, or posed any threat whatsoever to the officers at any time.

7.      After using a loud explosive device to blow a large hole in the family's second floor ceiling, they then detained the adult family members inside the home for an additional two hours before departing at approximately10:00AM.

8.      Officers shouted profanity and insults at the family, and used abusive and contemptuous language, all within the direct sight and hearing of the children.

9.      During the ensuring search of the house, officers damaged or destroyed personal property belonging to family members.  The hole they blew in the ceiling caused toxic plaster dust to rain down onto plaintiffs' clothes and belongings, forcing them to dispose of them, and causing a flare-up of asthma for 9-year-old Roy.

10. Officers confiscated cash belonging to family members, including $24 from 8-year-old Royal. This was money he earned from doing chores around the house.

11. Officers did not tell plaintiffs how to arrange for the City to make repairs to their home. As they were leaving the scene, Ms. Wilson asked the supervising officer, "Who's going to fix my home?" He simply shrugged his shoulders, said "Have a nice day" in a sarcastic tone, and walked away.

12. Officers did not apologize to the children or explain why they pointed guns at them or why they handcuffed 8-year-old Royal.

13. On March 15, 2019, Chicago police needlessly terrorized innocent children. Their manner of executing the search warrant - using excessive force against young children and their mother in front of the children's eyes - violated plaintiffs' constitutional rights.

14. This was not an isolated incident: as set forth below, it was undertaken pursuant to the City of Chicago's systemic, *de facto* policy of failing to protect young children from the unnecessary use of police force.

15. Roy, Royal and Royalty now suffer serious, emotional and psychological distress and injury, including symptoms of Post-Traumatic Stress Disorder, as a direct result of their exposure to defendant officers' use of excessive force. Their deep distress and related symptoms constitute scars on their young psyches that may never fully heal.

## JURISDICTION AND VENUE

16. This action arises under 42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658 (1978). This Court has jurisdiction pursuant to 28 U. S. C. §§ 1331 and 1343. The Court has supplemental jurisdiction of plaintiffs' state law claims.

17.     Venue is proper pursuant to 28 U. S. C. § 1391(b).  The underlying events occurred within the Northern District of Illinois; defendant City of Chicago is a municipal corporation located within the District; and all parties reside in the District.

<u>**PARTIES**</u>

18.     At the time of all relevant events, plaintiff Roy Smart was a nine-year-old boy residing with his mother, sister, and brother in a two-story, split-level house at 8914 S. Laflin Street in Chicago, Illinois, 60620.  On March 15, 2019, Roy was in third grade.

19.     At the time of all relevant events, plaintiff Royal Smart was an eight-year-old boy residing with his mother, sister and brother in a house at 8914 S. Laflin Street in Chicago, Illinois, 60620.  On March 15, 2019, Royal was in third grade.

20.     At the time of all relevant events, plaintiff Royalty Smart was a six-year-old girl residing with her mother and two brothers in a house at 8914 S. Laflin Street in Chicago, Illinois, 60620.  On March 15, 2019, Royalty was in first grade.

21.     At the time of all relevant events, plaintiff Alberta Domonique Wilson was the natural mother of Roy, Royal, and Royalty.  At the time of all relevant events, she resided with her three children at 8914 S. Laflin Street in Chicago, Illinois, 60620.  Ms. Wilson is a nurse.

22.     Plaintiffs are African-American.

23.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

24.     At the time of all relevant events, defendant John Nemec (star #19704) was a Chicago police officer assigned to the 7th District Tactical Team.  He was the affiant of the Complaint for Search Warrant that was presented to the warrant judge.  Officer Nemec and

scores of other, presently unidentified Chicago police officers participated in approving, obtaining, and executing the search warrant for 8914 S. Laflin Street in Chicago, Illinois, 60620.[1]

25.     On information and belief, the vast majority of officers who participated in the execution of the search warrant on March 15, 2019, were Caucasian males.

26.     When Chicago police officers executed the search warrant at 8914 S. Laflin Street in Chicago, Illinois, on March 15, 2019, they were at all times acting under color of law and within the scope of their employment as officers of the Chicago Police Department ("CPD") for the City of Chicago.

### Overview:  CPD's <u>M. O.</u> is to Unnecessarily Use Force Against and in the Presence of Young Children

27.     Chicago police officers have a *de facto* policy, widespread custom or *M. O.* of unnecessarily using force against or in the presence of children (ages 0-14), especially children of color, which traumatizes them.

28.     The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that CPD has a pattern and practice of using less-than-lethal, excessive force against children for non-criminal conduct.  (U. S. Dept. of Justice *Investigation of the Chicago Police Department*, Civil Rights Division and U. S. Attorney's Office for the Northern District of Illinois, Jan. 13, 2017, pp. 34-35).

29.     The 2016 report of the mayoral-appointed Chicago Police Accountability Task Force ("PATF") contained substantially similar conclusions and recommended a number of specific police reforms to improve police-youth interactions and the policing of youth.

---

[1] Plaintiffs will amend their complaint to join additional defendant officers once they learn their identity in discovery.

30.     None of the reforms that CPD has implemented or announced to date purport to remedy or address these problems.

31.     The federal consent decree agreed to by the City of Chicago and the State of Illinois in 2018 and subsequently entered by Judge Dow of this Court does not address them.

32.     CPD's recently revised use of force policy, GO3-02, does not expressly require officers to avoid using unnecessary force against or in the presence of young children whenever possible and does not require officers to use a trauma-informed approach to the use of force in situations where some police force is necessary.  CPD's search warrant policy, SO9-14, was not revised to incorporate these or similar changes.

33.     Unlike other major U.S. metropolitan police departments - such as Cleveland, Indianapolis, Charlotte, Baltimore, San Francisco and others - CPD still does not provide any training or supervision to officers concerning youth brain development or the importance of preventing trauma to young children by utilizing a trauma-sensitive approach to the use-of-force in situations where children are present.

34.     The connection between trauma and child development and between trauma and mental and physical health is well-established.

35.     It is also well-known that many poor children of color have already been subjected to multiple traumas in the neighborhoods and circumstances in which they live and, therefore, police should be mindful that their use of unnecessary force against or in the presence of poor, children of color would compound and deepen their trauma.

## FACTS RELATING TO ALL COUNTS

### *Officers Point Guns at the Children and Refuse to Lower Them*

36.     At approximately 5:50AM on Friday, March 15, 2019, Ms. Wilson and her children were still sleeping peacefully when scores of Chicago police officers, including a SWAT team, the 7th District Tactical Team, and patrol officers surrounded their house, directed loud noise and flashing lights at the house, and commanded them over bullhorn to come out with their hands up.

37.     Ms. Wilson woke up to noise that sounded like a helicopter or a loud motor, lights flashing through the windows from the front and the back of the house, and a loud, amplified voice that continually repeated, "8914:  COME OUT WITH YOUR HANDS UP FOR YOUR OWN SAFETY."  9-year-old Roy also thought he heard sirens.

38.     When Ms. Wilson looked out the window, she saw scores of police officers pointing rifles at her front door.  In shock and disbelief, she called relatives to let them know what was happening.  She woke the children up and had them grab and put on whatever clothes they could.

39.     In the street in front of the house and all around, there were approximately15-20 SWAT officers, 6 or more plain-clothed officers in jeans and vests, and 5 uniformed patrol officers.  A large, white SWAT vehicle emitting flashing lights from its roof was parked directly in front of Ms. Wilson's house.  A large suburban or SUV truck (from which officers later pulled a ladder that they took inside the house) and approximately 6 other unmarked and marked police vehicles were lined up down the street.  There were also 3-5 police vehicles in the alley behind Ms. Wilson's house.  The street was blocked off at both ends of Ms. Wilson's block.  A firetruck and ambulance were parked on a nearby cross street.

40.     On information and belief, some officers wore body cameras; some were activated and recording while others were not.

41.     Five of Ms. Wilson's six children were with her at her house that morning. In addition to Roy, Royal, and Royalty, two older sons, their spouses, and a granddaughter had slept over the night before.  Ms. Wilson planned to go to a funeral on March 15, and her sons were going to transport the younger children to and from school and babysit them for her.

42.     After quickly making her calls and getting the children dressed, Ms. Wilson tried to be calm before resolutely telling her children, "we have to go out."

43.     In reply, six-year-old Royalty, who looked out and saw officers pointing guns at the house, said, "No, they have big guns, and they're going to shoot us," and she turned around and ran from the front door, headed upstairs, crying and refusing to go out.  Royalty believed that, if her family went outside, officers would shoot them.

44.     After calling Royalty back, Ms. Wilson gathered her children together again, hugged and kissed them all, and said again, "come on, we have to go out."  To calm them, she instructed them, "Do what I do, and don't look at their guns.  Just walk and follow me."

45.     When she and her children were lined up at the front door and before they came out, she called to officers and told them that she has babies and children with her who are coming out, and she asked officers to lower their guns.  Officers did not lower their guns.

46.     At approximately 6:05, Ms. Wilson opened the front door to her house, and she and her family walked out of the house in a single-file line with their hands in the air. Mr. Wilson was first in the line, followed closely by her children, one after the other.

47.     In the early morning of March 15, 2019, it was 32 degrees Fahrenheit and raining.

48.     As the family walked out, officers were arrayed in front of plaintiffs' house in a semi-circle that stretched from one side of the house, to the street, and to the other

side of the house. All of them had their rifles and other guns trained on Ms. Wilson's family and the front door of the house.

49.     Officers told them, "HANDS UP. HIGH, HIGH. KEEP THEM UP. WALK TOWARDS ME. KEEP WALKING, KEEP WALKING."

50.     As Ms. Wilson and her children walked the short distance from the house to the middle of Laflin Street, where officers had them stop, at least 10 SWAT officers pointed rifles directly at them while other officers shined flashlights into their eyes.

51.     Ms. Wilson asked officers again to lower their weapons "because there are children here." The officers did not lower their weapons.

52.     When Ms. Wilson and her family had walked all the way to the street, SWAT officers were still pointing their rifles directly at them, including at Roy, Royal and Royalty.

53.     Officers aimed their rifles directly at Roy, Royal and Royalty and other family members for at least two minutes.

***Officers Handcuff 8-Year-old Royal for 40 minutes, as well as Ms. Wilson and the Adult Children in Front of the Younger Ones***

54.     When the family reached the middle of the street where the officers were, officers grabbed them and put them in handcuffs while other officers continued to point guns at them. They continued pointing guns at the whole family, including at Roy, Royal, Royalty, until they had handcuffed everyone they could handcuff, then they finally lowered their guns.

55.     Chicago police officers handcuffed 8-year-old Royal. They handcuffed his arms behind his back while he stood in the street. Royal was shaking from fear and, a few minutes later, from cold as well. As he stood handcuffed in the street, Royal did not know what officers were going to do to him and his family. His wrists hurt, and he reached the point where

he was crying and couldn't take the pain and discomfort anymore. He later had a bruise on his right wrist because officers had handcuffed him too tightly.

56.     A short, soft-spoken, well-mannered boy, Royal did not give officers the least reason to handcuff him.

57.     Officers also handcuffed Ms. Wilson and the older siblings in front of Roy, Royal, and Royalty.

58.     In particular, officers handcuffed Ms. Wilson's adult sons, Maurice Brown, 26, and Kimoney Midderoff, 19, as well as Kimoney's girlfriend. All of them were handcuffed behind their back. Officers grabbed the arm of Sharron, Maurice's girlfriend, and started to handcuff her, but she was holding Ms. Wilson's 2-year-old granddaughter, Amir, and protested, "My baby has no shoes or socks on; he can't stand on the cold, wet ground." Officers stopped trying to handcuff her and let her just hold the baby.

59.     Officers did not handcuff Roy, who is older and taller than Royal, and they did not handcuff Royalty. An officer reported to the Sergeant the number of people who were handcuffed and the number who were not. At about 6:30AM, an officer asked the Sergeant if any more handcuffs had arrived on the scene. On information and belief, the only reason officers did not also handcuff 9-year-old Roy and 6-year-old Royalty is that they ran out of handcuffs.

60.     The whole family was soon soaking wet and freezing cold. Roy did not have a coat on. Royal wore a hoodie. Royalty wore a thin jacket. The family did not have umbrellas.

61.     During the detention, officers were rude, aggressive and cursed in front of the children. As they were handcuffing Maurice, one said to him, "HOLD ON, BITCH." To

Sharron, who complained that her baby had no shoes, was cold, rain-soaked, and needed his diaper changed, an officer shouted at her, "YOU'RE JUST GOING TO HAVE TO FUCKING DEAL WITH IT!" To Kimoney, an officer said, "IS THERE ANY FUCKING THING WE FUCKING NEED TO KNOW BEFORE WE GO INSIDE THAT FUCKING HOUSE??!!"

62. As the family was being handcuffed, SWAT officers began to enter the house.

63. While handcuffed and standing in the street, Ms. Wilson repeatedly asked to see the search warrant. An officer told her, "The search warrant is on the way."

64. Meanwhile Royal's handcuffed wrists were hurting, and he complained to his older brother, Maurice. His older brother, Maurice, finally told an officer, "He's hurting, he's only eight, he can't take it anymore. It's wrong. [The children] have already seen things they're not supposed to see." Ms. Wilson also asked officers to take Royal out of handcuffs. The officer told her "no" and to wait for the sergeant.

65. After Royal had been handcuffed for approximately 35-40 minutes and was crying from the pain and visibly shaking from fear and cold, Ms. Wilson asked the supervising officer to take the handcuffs off of him.

66. At about this time, Ms. Wilson's sister, Stephanie Wilson, arrived on the scene about 6:30 or 6:40 and asked officers to be allowed to take the younger children with her. At first, they refused. She waited on the sidewalk two or three houses south, not permitted to get any closer.

67. At no time did officers ask Alberta Wilson if there is anyone who can take custody of and care for the children during the detention and search.

68. After the search warrant arrived on the scene about 6:45AM and Ms. Wilson gave the children's names and birthdates to officers, officers let Royal out of handcuffs and released Roy, Royal, Royalty and Amir to Ms. Wilson's sister, who was still waiting on the sidewalk. Amir was crying, still had bare feet and an unchanged diaper. All of the children were completely soaked and frigid by this time.

69. After Ms. Wilson's sister left with the children, officers then kept Ms. Wilson, her adult sons and their girlfriends handcuffed outside in the freezing rain for an additional hour and 20 minutes - a total of two hours' handcuffed detention in the freezing rain - until 8:00AM when officers ordered them to go back into the house. After approximately an hour in handcuffs, Ms. Wilson felt lightheaded, like she was going to pass out, and officers re-cuffed her.

70. During the prolonged detention, officers showed the search warrant to Ms. Wilson, and she answered their questions while officers also questioned her older children, especially Kimoney.

71. While still handcuffed and standing outside, Ms. Wilson at one point heard what sounded like a loud explosion coming from inside her house.

### *Officers Search, Damage and Seize the Family's House and Possessions, including Royal's $24 He Earned from Chores*

72. When Ms. Wilson re-entered her house along with officers who continued to search, she found a gaping hole in her second-floor, hallway ceiling. The hole stretched the entire length of the hallway. A positioned ladder lead through the hole into the attic or roof cavity above. Officers were inside the roof cavity, searching. There were smoke marks on the ceiling near the hole.

73.    For two hours, between 8:00 and 10:00AM, officers searched throughout the house, while about four officers, including the Sergeant, continued to search inside the attic or roof cavity.

74.    The hole in the hallway ceiling also caused creeping damage and additional holes in the adjacent ceiling in Ms. Wilson's bedroom and closet.

75.    Officers did not need to blow a hole the ceiling.  There was a ready-made hatch to the roof cavity in the closet in the boys' bedroom.

76.    In all bedrooms, officers overturned mattresses and threw the family's clothes out of drawers and bags.  Plaster and noxious insulation stuffing fell from the holes in the ceiling and mixed with the family's clothes, important papers and other items strewn all over the floors, creating a health hazard.  Ms. Wilson had to throw away all of the clothes.

77.    From breathing the plaster dust that was everywhere, Roy had a flare-up of asthma that lasted two weeks following the incident.

78.    During the search, officers did not find any guns or other contraband, and they did not arrest or charge anyone.

79.    Officers indiscriminately confiscated all of the family's cash that they found, including $24 that belonged to 8-year-old Royal.  Ms. Wilson had recently withdrawn cash from her bank account, as she was about to put down a security deposit on a new house, as well as pay utility bills at her existing house.

80.    Officers did not tell Ms. Wilson that they had confiscated cash from the house or how to go about retrieving her family's money.  Along with a copy of the search warrant, officers left on the kitchen counter an unreadable copy of an inventory sheet.  She discovered only later that her money was missing.

81.     Officers also confiscated some of Ms. Wilson's mail.

82.     As officers prepared to leave, Ms. Wilson asked the supervising officer, "Who's going to fix my home?"  He simply shrugged his shoulders, sarcastically said, "Have a nice day," and walked away.  Those were officers' last words to Ms. Wilson.

83.     Officers gave Ms. Wilson zero information about how to deal with the overwhelming physical damage to her house.

84.     Officers did not ever apologize or explain their actions to the children.

85.     At approximately 11:00AM, Ms. Wilson had an emotional breakdown. She went and sat in her car and cried, before going back inside and beginning to search for her IDs, her wallet and important papers.

### Officers' Uses of Force Against and in the Presence of Roy, Royal and Royalty Were Totally Unnecessary

86.     None of the plaintiffs or family members presented any threat, real or apparent, at any time to police officers on the scene.  All of them followed officers' instructions. None resisted or fled.

87.     Even though they presented no threat, officers repeatedly pointed their rifles and guns at them, and other officers did not intervene to ask them to stop.

88.     Moreover, officers knew immediately upon seeing the family that little Roy, Royal and Royalty posed no threat whatsoever.

89.     Plaintiffs have been harmed by officers' unnecessary pointing of guns at them and their prolonged, unlawful detention of Royal and other family members.

### Officers Engage in Subsequent Harassment

90.     In the days following the incident, several times and seemingly for no reason police pulled Ms. Wilson over as she was driving her car near her home.  In one incident,

the officer who approached on the passenger's side had his gun drawn and pointed at Ms. Wilson's car. Royalty was in the car with Ms. Wilson.

91.     Ms. Wilson told the officer on the driver's side that she has a baby in the car and asked him to ask the other officer not to point it at her and to lower it. The officer lowered his gun. Officers claimed they stopped her because her inside lights were on.

### *Officers' Unnecessary Uses of Force Traumatized Roy, Royal and Royalty*

92.     Chicago police officers' terrorizing conduct toward Roy, Royal and Royalty and towards their mother and other family members in the children's presence caused Roy, Royal and Royalty immediate, severe and lasting emotional and psychological distress and injury.

93.     Prior to March 15, 2019, Roy, Royal, and Royalty were happy, healthy children in a close, loving family. They had suffered no emotional or psychological trauma of any kind in their lives. That changed with defendants' actions on March 15, 2019.

94.     During their detention by Chicago police, Roy, Royal, and Royalty were screaming, crying and terrified, and Royal was in pain from the handcuffs. Based upon what she saw, Royalty believed the police were going to shoot her and her family as soon as they walked out of their house.

95.     Ever since the incident, Roy, Royal, and Royalty have continued to re-live, in various ways, how traumatized they were that day.

96.     The children dwell on the incident and ask questions like, "Why did the police come?" "Why did they have their guns out?" "Why were they aiming guns at us as we walked out?" "Why was Royal in handcuffs?" "Why did they mess up/do this to our house?" "Can we move houses?" "Are we going to be ok?"

97.     Royalty asked her mother, "Do police just shoot you in your back when you turn around?"

98.     After the incident, the children did not want to go home to 8914 South Laflin Avenue.  They spent the next two nights and three days at the house of their aunt, Stephanie Wilson.  All three children now regularly sleep in their mother's room, refusing to sleep in their own rooms by themselves.

99.     All three children now have trouble sleeping.  They have difficulty falling or wanting to fall asleep, and they wake up in the middle of the night or in the early morning, unable to go back to sleep.  All three children report nightmares.

100.     Roy regularly has bad dreams, often two times per night, in which SWAT surrounds the house, breaks the windows, tells him to put his hands up, and knocks him out.

101.     Royal dreams about the police coming back and shooting the family.  He dreams about them being outside, knocking on the door and pointing guns in his and his family's faces and shooting his family.  He wakes up most nights and goes in his mother's room, crying and saying he can't sleep.

102.     Royalty says that, in her dreams, the police come back to the house. Royalty said, "Every time I wake up, I think about what happened."  Roy and Royal each said, "Me, too."

103.     Royalty now tells her mother seemingly out of the blue, "I love you." When her mother asks her why she says that, Royalty responds, "Because police came to our house, and it scared me."

104.     The children are now anxious whenever they or their mother have to leave.  They tell her they love her.

105.     Royalty now does not like to go to the bathroom by herself.

106.     The children missed school the day of the incident.  They went back to school Monday, but now they do not even want to go to school.

107.     Since they started back at school, Ms. Wilson has had to get Roy from school in the middle of the day because he was "not himself" and kept leaving the classroom. The teacher did not know what to do, and the school called her.  When Ms. Wilson picked him up, he told her, "I'm just worried about you.  My mind had been on the police and what happened."

108.     Before the incident, Royalty liked to go to school and was on the honor roll.  But on March 26, for example, she was crying when she went to school.  She did not want to leave her mother and did not want her mother to be at the house.

109.     Roy now experiences fear and shivers during the day when he gets home from school.

110.     The children do not like their house anymore and want to move.  The house is "spooky" to them now.  They no longer feel safe in their own home.

111.     Whenever Royalty is in the car with her mom and sees a police car, she starts shaking and crying, tears running down her face.

112.     The three children did not have a bad impression of police before the incident.  Now, they say what happened was "evil."

113.     Roy, Royal, and Royalty now continue to experience and exhibit, unabated, these and other signs of severe emotional and psychological trauma and distress.

114.     On information and belief, the children have, or have many of the symptoms of, severe Post-Traumatic Stress Disorder.

115.     As a direct result of officers' conduct, all three children are now being medically assessed for trauma inflicted by the Chicago police.

116.     On information and belief, both now require high quality, long-term, costly, psychological care and counseling in order to cope with the long-term, psychological injuries caused by defendants' terrorizing and unnecessary display of force towards and in the presence of the children.

117.     Ms. Wilson is also suffering serious mental distress as a result of officers' conduct.

118.     Officers' shocking actions of repeatedly pointing and training loaded rifles and pistols at close range on young children, their mother and other close relatives in their presence, handcuffing 8-year-old Royal and handcuffing their mother in front of the children, and detaining all of them at length in the cold rain, constituted serious abuses of power and authority.

119.     Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed towards *6, 8, and 9-year-old children.*  The children's sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

120.     As alleged above, officers' conduct was undertaken pursuant to and is part of a long-standing and widespread pattern and practice, *de facto* policy or *MO* of Chicago police officer use of excessive force that includes the use of unnecessary force against and/or in the presence of children.

### COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM
### AGAINST THE CITY OF CHICAGO
### (Minor Plaintiffs Roy, Royal and Royalty)

121.    Plaintiffs Roy, Royal and Royalty Smart re-allege all paragraphs 1-120 above and incorporate them into this count, including the *Monell*-related allegations of paragraphs 27-35.  They assert this claim against defendant City of Chicago.

122.    Defendant officers' use of excessive force against and in the presence of Roy, Royal and Royalty was directly and proximately caused by one or more of the following three, specific, long-standing, interrelated, *failures* of official policy, *lack* of official policy, *de facto* policies, widespread practices, and/or customs of the City of Chicago:  1) a pattern and practice of using unnecessary or excessive force against children (ages 0-14); 2) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force against children; and 3) an absence of official policy and training to avoid the unnecessary or excessive use of force against and in the presence of children.  Each of these policies existed for more than six years prior to March 15, 2019 ("the *Monell* period").

123.    First, defendant City of Chicago has a long-standing, pervasive practice and custom of failing to adequately investigate, intervene with and discipline or otherwise correct officers for the use of excessive force involving children (ages 0-14), including unnecessary force directed at children and/or at adult family members in the presence of children.

124.    This set of City's widespread practices or customs directly encouraged, authorized and caused officers' conduct toward Roy, Royal and Royalty.  The City's historical failure, leading up to March 15, 2019, to properly intervene in, investigate and discipline officer excessive force, especially excessive force against or in the presence of young children, caused officers to act without appropriate restraints in the presence of Roy, Royal and Royalty.

125.     This was facilitated by unjustified exemptions from the bodycam mandate and a complete lack of official disciplinary consequences for officers who do not wear or do not turn on their bodycams.

126.     The City was on notice of each of these failures of official policy from the specific conclusions reached by and the data contained in the 2017 U. S. Department of Justice investigative and the PATF reports (citations above).

127.     Second, defendant officers' conduct towards and in the presence of Roy, Royal and Royalty was undertaken as a direct consequence of defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring officers to avoid using unnecessary or excessive force against children or against their adult relatives in the children's presence whenever possible.

128.     Even after the findings of the U. S. Department of Justice investigation and the Mayor's PATF were known to City policy makers, the City failed to implement or announce implementation of any reforms that purported to remedy the pattern and practice of unnecessary use of force against and/or in the presence of children, a failure which amounted to a deliberate choice not to take action to prevent the violation of plaintiffs' constitutional rights. City and CPD's failure to implement these explicit policies, reforms and priorities was a cause of the injuries to Roy, Royal and Royalty.    Specifically, this lack of official policies, training, and reforms includes:

a.     The continued absence of any provision in CPD's official use of force policy that would explicitly guide or require officers to avoid using force against or in the presence of children, or to use a trauma-informed approach to the use of force in situations where children are present, and some force may necessary;

b.      CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit guidance or requirement that officers should avoid using force against or in the presence of children, or to use a trauma-informed approach to the use of force in situations where children are present and some force may be necessary;

c.      CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (i) whether children reside in the residence, (b) to avoid entry and search at times when children are likely to be present (ii) to de-escalate themselves or change tactics when they unexpectedly encounter young children, and/or (iii) to take other precautions to avoid traumatizing children, such as avoiding placing parents and grandparents in handcuffs in the children's presence;

d.      CPD's rebuff, both before and since the U. S. Department of Justice and PATF reports were released, of national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children and/or offered model use-of-force policies that included explicit provision for avoiding the unnecessary use of force against and in the presence of children; and

e.      City's and CPD's refusal or failure to propose or agree to any explicit protections for children from excessive force or any provisions requiring a trauma-informed approach to policing children in the federal consent decree it negotiated with the State of Illinois.

129.    Third, the City's lack of official policies to protect children from unnecessary officer use of force, combined with its failure to hold accountable officers who use

unnecessary force involving children, have resulted in a *de facto* City policy and practice of using unnecessary or unreasonable force against young children and/or in their presence, as concluded by the U. S. Department of Justice investigation into the Chicago Police Department and the PATF.  The excessive force used against or in the presence of Roy, Royal and Royalty was an example of and the result of this *de facto* policy.

130.    Through their combined failures, before and after notice, to enact official policies that protect children from unnecessary force and to hold accountable officers who use excessive force against children, the City has led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, CPD's Bureau of Internal Affairs ("BIA"), the Chicago Police Board, the Independent Police Review Authority ("IPRA") or the Civilian Office of Police Accountability ("COPA").  These past failures directly authorized, encouraged and emboldened defendant officers' conduct against and in the presence of Roy, Royal, and Royalty, providing them a general license to use excessive force involving children whenever it suits them.

131.    Finally, with respect to SWAT officers exclusively, City has unofficial and official policies that give them *carte blanche* license and encouragement to use extreme amounts of force against citizens, including young children, with impunity:  a) CPD does not properly vet and select officers for SWAT teams, consistent with the standards of the National Tactical Officers' Association; b) CPD SWAT supervisors fail to conduct systematic pre-planning and surveillance for vulnerabilities, including for the presence of young children; and c) when conducting operations, SWAT officers do not wear body cams, have their faces covered except for their eyes, and do not wear or display readily identifiable name plates or badges.  The latter makes it virtually impossible for citizens to identify SWAT officers, to file misconduct

complaints about them, and to have their complaints properly investigated or sustained. Yet the special job of SWAT officers is to use an extraordinary amount of force against citizens. Under these policies, SWAT officers are not and cannot be held accountable for the use of excessive force, including excessive force against children.

132.    Through their combined failures, before and after notice, to enact official policies protecting children from unnecessary force and to hold accountable officers who use excessive force against children, final City of Chicago policy-makers – including the Superintendent of police, the Administrator of IPRA (now COPA), the head of CPD's BIA, the Mayor, and the Chicago City Council – condoned, approved, facilitated, encouraged and perpetuated a *de facto* City policy and practice of unnecessary or excessive force against or in the presence of young children.

133.    During all times relevant to the incident involving Roy, Royal and Royalty, a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA, the Chicago Police Board, IPRA and COPA, contributing to these agencies' collective failure to properly investigate and discipline officer excessive force, including excessive force against children. Unjustified exemptions from the bodycam mandate and a complete lack of official discipline and accountability for officers who do not wear or do not turn on their bodycams reinforce the code of silence. Defendant officers' conduct toward Roy, Royal and Royalty, including their failure to intervene and failure to report the actions of their colleagues, was the direct result of the long-standing and systematic code of silence at work in the City's police investigative and disciplinary systems.

134.    By means of its pervasive customs and practices above and its failures, after notice, to remedy officers' use of unnecessary force against and/or in the presence of young

children, defendant City of Chicago has manifested and manifests deliberate indifference to the deprivation of Roy, Royal and Royalty's constitutional rights.

135.    One or more of these three polices, practices and customs collectively, directly and proximately caused the violations of Roy, Royal and Royalty's constitutional rights set forth above and below and the resulting injuries, such that the City of Chicago is liable for officers' use of excessive force against them and/or in their presence.

### The City of Chicago's *De Facto* Policies Resulted in Violations of Roy, Royal and Royalty's Constitutional Right to be Free of Unnecessary or Excessive Force

136.    Officers' conduct toward each Roy, Royal and Royalty constituted excessive force, in violation of their rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

137.    Under the circumstances, officers' displays of force against and in the presence of young children was totally unnecessary, unreasonable and unjustifiable.

138.    Under the circumstances, officers' uses of force against Roy, Royal and Royalty's mother and older siblings, undertaken in the presence of and witnessed by Roy, Royal and Royalty, was totally unnecessary, unreasonable and unjustifiable.

139.    Officers failed to intervene to stop any use of force.

140.    Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Roy, Royal and Royalty's constitutional rights.

141.    Officers' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

142.    The officers' misconduct was undertaken pursuant to and as the direct and proximate result of the Defendant City of Chicago's *de facto* policy, failures of official policy, absences of affirmative policy, and pervasive, long-standing practices and customs, as set forth

above, such that defendant City of Chicago is liable for officers' use of unnecessary force against

and in the presence of Roy, Royal and Royalty.

143.    As the direct and proximate result of officers' misconduct, plaintiffs Roy,

Royal and Royalty have suffered and continue to suffer severe, long-term emotional and mental

distress and trauma, including lasting or permanent psychological injury.

144.    One or more officers had a reasonable opportunity to prevent or stop the

violations of Roy, Royal and Royalty's constitutional rights but stood by and failed to take any

action.

145.    Officers' inactions in this respect were objectively unreasonable and

undertaken intentionally, with malice and reckless indifference to Roy, Royal and Royalty's

constitutional rights.

146.    As set forth above, the officer misconduct was undertaken pursuant to the

*de facto* policies, long-standing and pervasive practices and customs of defendant City of

Chicago, such that the City of Chicago is also liable for officers' failure to intervene.

147.    As the direct and proximate result of officers' misconduct, Roy, Royal and

Royalty suffered and continue to suffer injury and harm.

### COUNT II – UNLAWFUL SEARCH – UNREASONABLE MANNER OF ENTRY AND SEARCH – 42 U. S. C. § 1983 (All Plaintiffs)

148.    Plaintiffs Ms. Wilson, Roy, Royal and Royalty re-allege paragraphs 1 –

120 above and incorporate them into this count.  All plaintiffs assert this claim against all

defendant officers.

149.    The manner in which officers conducted their entry into and search of plaintiffs' house were objectively unreasonable, in violation of Plaintiffs' Fourth Amendment rights.

150.    For example, they pointed guns at plaintiffs at close range for an unreasonably long time, they handcuffed 8-year-old Royal for 40 minutes, they cursed at and insulted plaintiffs, they detained Ms. Wilson in the freezing rain for two hours and in her home for another two hours, and they damaged or destroyed plaintiffs' personal property.

151.    Officers' manner of entry and search was objectively unreasonable in these and other ways and was undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

152.    Under the circumstances, officers had reasonable alternative law enforcement techniques available to them for effective entry, detention and search.

153.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent

154.    Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs.  Defendant officers' shocking displays of force against a totally unarmed family with young children constituted an abuse of power and authority.  Defendant officers' actions set forth above were directed towards unarmed citizens who were fully compliant and cooperative and innocent of all criminal conduct.

155.    Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others, especially children.  Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known

safety and health of plaintiffs was involved.  Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

156.    In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, especially Roy, Royal, and Royalty, defendants' conduct merits an award of punitive damages.

## COUNT III – FALSE ARREST AND FALSE IMPRISONMENT – 42 U. S. C. § 1983
### (All Plaintiffs)

157.    All plaintiffs re-allege paragraphs 1 – 120 above and incorporate them into this count.  They assert this claim against all defendant officers.

158.    Officers arrested and imprisoned plaintiffs when, (a) without a warrant for their arrest and without probable cause to arrest them, they (a) made plaintiffs stand outside in the freezing rain for approximately 40 and 120 minutes, respectively; (b) handcuffed and/or confined Royal; and (c) handcuffed Ms. Wilson, even though they were not the targets of the warrant and did not remotely resemble the target.

159.    Officers' actions constituted a violation of plaintiffs Fourth Amendment right to be free from unreasonable searches and seizures.

160.    When officers handcuffed and/or confined plaintiffs, they unlawfully deprived them of their liberty to move about, despite the fact that they had done nothing illegal and that officers had no probable cause for their arrest and imprisonment.  This violated plaintiffs' rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

161.    One or more officers had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights but stood by and failed to take any action.

162.     Through physical force and the invalid use of legal authority, officers acted to arrest, restrain and confine each plaintiff to a bounded area.

163.     Plaintiffs were acutely aware of and were harmed by officers' confinement, as detailed above.  *Inter alia*, Roy's wrists were in pain, Ms. Wilson was lightheaded, and all plaintiffs were soaked in rain and freezing.

164.     Officers' actions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

165.     As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

## COUNT IV – UNCONSTITUTIONAL SEIZURE OF PROPERTY - 42 U. S. C. § 1983
### (Plaintiffs Ms. Wilson and Royal)

166.     Plaintiffs Ms. Wilson and Royal incorporate paragraphs 1 – 120 above and assert this claim against all defendant officers.

167.     As set forth above, defendant officer unnecessarily or willfully damaged, destroyed, converted and confiscated plaintiffs' personal property during the course of their search.  They damaged or destroyed plaintiffs' clothes.  They took and have not returned cash from Ms. Wilson and Roy.  Defendant officers took these actions without any lawful basis and without ever returning plaintiffs' property to them or paying them any compensation for damage or destruction they caused.

168.     Defendant officers' actions constituted an unreasonable seizure of plaintiffs' property, in violation of their rights under the Fourth Amendment and Fourteenth Amendments to the U. S. Constitution, as well as a deprivation of property without due process of law, in violation of their rights under the Fourteenth Amendment.

169. Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful, malicious and reckless indifference to plaintiffs' constitutional rights.

170. Defendants' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

171. As a result of defendant officers' misconduct described in this Count, plaintiffs have suffered injury, including emotional distress and financial harm.

### COUNT V – ASSAULT – STATE LAW
### (All Plaintiffs)

172. Plaintiffs incorporate paragraphs 1 – 120 above in this count. They assert this claim against defendant City of Chicago.

173. The actions of officers set forth above, including pointing guns at close range at plaintiffs, created reasonable apprehensions in plaintiffs of immediate harmful contact to plaintiffs' persons.

174. The officers intended to bring about apprehensions of immediate harmful contact in plaintiffs or knew that their actions would bring about such apprehensions.

175. In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

176. The conduct of defendant in entering and executing a residential search warrant are generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

177.     The Officers' actions were the direct and proximate cause of plaintiffs' apprehensions.

178.     Plaintiffs have been seriously harmed by officers' actions.

## COUNT VI – BATTERY – STATE LAW
### (Ms. Wilson and Roy)

179.     Plaintiffs Ms. Wilson and Roy re-allege and incorporate paragraphs 1 – 120 above into this count.  They assert this claim against defendant City of Chicago.

180.     The actions of defendant officers set forth above, including handcuffing an 8-year-old for 40 minutes and keep Ms. Wilson handcuffed for 60 minutes, when neither of them were targets of the search warrant, brought about harmful and offensive physical contacts to plaintiffs' persons.

181.     The officers intended to bring about harmful and offensive physical contact to plaintiffs' persons.

182.     In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

183.     The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

184.     The officers' actions were the direct and proximate cause of harmful and offensive physical contact to plaintiffs' persons.

185.     Plaintiffs were seriously harmed by officers' actions.

### COUNT VII – FALSE ARREST AND FALSE IMPRISONMENT– STATE LAW
### (All Plaintiffs)

186.    Plaintiffs re-allege paragraphs 1 – 116 above and incorporate them into this count.  Plaintiffs assert this claim against defendant City of Chicago.

187.    Officers arrested and imprisoned plaintiffs when, (a) without a warrant for their arrest and without probable cause to arrest them, they (a) made plaintiffs stand outside in the freezing rain for approximately 40 and 120 minutes, respectively; (b) handcuffed and/or confined Royal; and (c) handcuffed Ms. Wilson, even though they were not the targets of the warrant and did not remotely resemble the target.

188.    Officers' actions restrained plaintiffs and confined them to bounded areas.

189.    Officers intended to restrain and confine plaintiffs to bounded areas within or outside the house.

190.    In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

191.    The conduct of defendant officers in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

192.    Officers' actions caused the restraint and confinement of plaintiffs to bounded areas within and outside the house.

193.    Plaintiffs were harmed by officers' actions in restraining and confining them, as detailed above.

## COUNT VIII - INTENTIONAL AND/OR NEGLIGENT INFLICTION
## OF EMOTIONAL DISTRESS – STATE LAW
### (Minor Plaintiffs Roy, Royal, and Royalty)

194.    Plaintiffs Roy, Royal, and Royalty re-allege and incorporate paragraphs 1

– 120 above in this count and assert this claim against defendant City of Chicago.

195.    The actions, omissions and conduct of officers set forth above were

extreme and outrageous and exceeded all bounds of human decency.

196.    Officers' actions, omissions and conduct above were undertaken with the

intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high

probability that their conduct would cause such distress, or in reckless disregard of the

probability that their actions would cause such distress.

197.    Officers, who occupied positions of special trust and authority, knew, had

reason to know or believed that plaintiffs, who were young children, were especially vulnerable

and fragile.

198.    As a direct and proximate result of officers' extreme and outrageous

conduct, plaintiffs suffered and continue to suffer long-term, severe emotional distress and

trauma.

199.    In the alternative, officers owed plaintiffs a duty of care that they breached

when they pointed guns at them, pointed guns at their family members in their presence,

handcuffed Roy and handcuffed Ms. Wilson and other adult family members in front of the

children.  Plaintiffs are direct victims of officers' negligent infliction of emotional distress.

200.    In the alternative again, the conduct of defendants was willful and wanton

and constituted a course of action which shows an actual or deliberate intention to cause harm or

which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

201.     The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

202.     Officers' conduct was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

### COUNT IX – *RESPONDEAT SUPERIOR* – STATE LAW  *(All Plaintiffs)*

203.     Plaintiffs re-allege paragraphs 1-120 and 172 – 202 above and incorporate them into this count.  Plaintiffs assert this claim against defendant City of Chicago.

204.     In committing the acts and omissions alleged above, officers were at all times members and agents of CPD and the City of Chicago and were acting within the scope of their employment.

205.     Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its agents within the scope of their employment.

### COUNT X – INDEMNIFICATION – STATE LAW (All Plaintiffs)

206.     Plaintiffs re-allege and incorporate paragraphs 1-120 and 172 – 202 above. Plaintiffs assert this count against defendant City of Chicago.

207.     Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

208.     Involved officers were and are employees of the City of Chicago who acted within the scope of their employment when committing the actions and omissions detailed above.

## **PRAYER FOR RELIEF (ALL COUNTS)**

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendant on each count for:

a.     Compensatory damages;

b.     Punitive damages on count II-IV;

c.     Reasonable attorney's fees and litigation costs and expenses; and

d.     Such other or further relief as the Court deems just.


Respectfully submitted,


s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com
www.alhofeldlaw.com

34

**JURY DEMAND**

Plaintiffs demand trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

**NOTICE OF LIEN**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

**NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS**

I, Al Hofeld, Jr., an attorney for plaintiffs, hereby certify that on May 7, 2019, filing and service of the foregoing *Complaint* was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 and the Federal Rules of Civil Procedure as to service on any party who is not a Filing User or represented by a Filing User.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com
www.alhofeldlaw.com